## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

JEREMIAH LORENZ MOUZON,    )
                                     )
      Plaintiff,          )
                                     )
v.                               )           Civil Action No. 3:23CV101–HEH
                                     )
STACEY KINCAID, *et al.*,      )
                                     )
      Defendants.      )

### <u>MEMORANDUM OPINION</u>
### (Granting Motion for Summary Judgment)

Jeremiah Lorenz Mouzon, a Virginia inmate proceeding pro se and in forma pauperis, filed this 42 U.S.C. § 1983 action. The action is proceeding on Mouzon's Second Particularized Complaint. (ECF No. 28.) Mouzon's claims relate to an August 14, 2021 use of force carried out by Lt. Salzman, Sgt. Field, Sgt. Wright, and Deputy Crossan, who are officials at the Fairfax County Adult Detention Center ("FCADC"). (*See id.*) The following claims remain before the Court:

> **Claim One:** Defendants Crossan, Salzman, Field, and Wright violated Mouzon's right to be free from the use of excessive force when they utilized excessive amounts of (a) oleoresin capsicum ("OC") spray and (b) pepperballs to gain his compliance. (*Id.* at 1.)

> **Claim Two:** Defendants Crossan, Salzman, Field, and Wright violated Mouzon's rights when they did not decontaminate him after employing the chemical agents and left him confined in a restraint chair without the opportunity to shower for three days. (*Id.* at 2.)

Mouzon seeks monetary damages and a declaratory judgment. (ECF No. 1, at 9–10.)

The matter is before the Court on Defendants' Motion for Summary Judgment (ECF No. 61), in response to which Mouzon has filed an untimely Opposition (ECF No. 73). Defendants have filed a Reply. (ECF No. 74.) For the reasons stated below, the Motion for Summary Judgment (ECF No. 61) will be GRANTED.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility to inform the court of the basis for the motion, and to identify the parts of the record that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

2

255 (1986)).  However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)).  "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448).  Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

In support of the Motion for Summary Judgment, Defendants submit:  (1) FCADC records (ECF No. 62-1); (2) the declaration of Sgt. George Wright (ECF No. 62-2); (3) two videos depicting Defendants' use of force and Mouzon's subsequent placement in a restraint chair (ECF Nos. 62-3–62-4); (4) medical records generated after the use of force incident (ECF No. 62-5); (5) photographs of Mouzon's cell and its contents following the use of force incident (ECF No. 62-6); (6) an incident report documenting Mouzon's eventual removal from the restraint chair (ECF No. 62-7); and, (7) an observation log documenting Mouzon's activity at FCADC (ECF No. 62-8).

As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp.*, 477 U.S. at 324.  The Court has examined the record for any such admissible evidence and found none.  Indeed, despite

3

the Court's previous warnings that it would "not consider as evidence . . . a memorandum of law and facts," whether sworn or unsworn, and that Mouzon must instead submit a sworn statement or affidavit, Mouzon has filed only an unsworn and untimely opposition.[1]  Mouzon's Complaint, Particularized Complaint, and Second Particularized Complaint are similarly inadmissible, as they are also unsworn.[2]

Even so, Mouzon's failure to file admissible evidence in opposition to Defendants' Motion for Summary Judgment is not a sufficient independent basis on which to grant the Motion. *See Custer v. Pan American Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993). Federal Rule of Civil Procedure 56(c) sets forth procedures for the moving party to establish, by way of appropriate evidentiary support, that it is "entitled to a judgment as a

---

[1] On October 24, 2025, the Court issued a Memorandum Order (1) directing Virginia Department of Corrections officials to permit Mouzon to view the video evidence Defendants submitted in support of the Motion for Summary Judgment, (2) granting Mouzon's request that Defendants be compelled to respond to his discovery requests, and (3), granting Mouzon thirty additional days to oppose the Motion for Summary Judgment. (ECF No. 71.)  Accordingly, any response to the Motion for Summary Judgment was due by Monday, November 24, 2025.  Mouzon failed to meet this deadline by his own admission. (*See* ECF No. 73, at 19.)

[2] The Complaint contains the following verification:

> I have read the foregoing Complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

(ECF No. 1, at 10.)  This verification is virtually identical to one that this Court previously rejected in *Hogge v. Stephens*, No. 3:09CV582, 2011 WL 2161100, at *2–3 (E.D. Va. June 1, 2011), and is substantially similar to one that the United States Court of Appeals for the Fourth Circuit found inadequate in *Walker v. Tyler Cnty. Comm'n*, 11 F. App'x 270, 274 (4th Cir. 2001).  Accordingly, the Complaint's allegations do not amount to admissible evidence and are instead "mere pleading allegations." *Hogge*, 2011 WL 2161100, at *2–3.  The Particularized Complaint and Second Particularized Complaint do not contain any verifications whatsoever. (*See* ECF Nos. 19, 28.)

4

matter of law." Fed. R. Civ. P. 56(c). The non-moving party's failure to properly oppose the summary judgment motion "may leave uncontroverted those facts established by the motion," but does not automatically entitle the moving party to a favorable judgment. *See Custer*, 12 F.3d at 416.

In light of foregoing submissions and principles, the following facts are established with respect to the Motion for Summary Judgment.

## II. SUMMARY OF PERTINENT FACTS

### A.    Mouzon's Status as a Pretrial Detainee

At all times relevant to this action, Mouzon was a pretrial detainee incarcerated at FCADC. (ECF No. 62-1.)

### B.    The August 14, 2021 Uses of Force

#### 1.    Officers' First Two Deployments of OC Spray

At approximately 10:00 a.m. on August 14, 2021, while delivering medications to inmates at the facility, Nurse Kassaye and Deputy Crossan observed Mouzon apparently "hiding" his medication. (ECF No. 62-2 ¶¶ 3–4.) Because Mouzon had at least two similar prior incidents regarding his medication (*see* ECF No. 62-1, at 8, 11, 13–14), Deputy Crossan requested that Mouzon return his pill and called for backup when Mouzon failed to comply (ECF No. 62-1 ¶ 5).

Sergeant George Wright, Lt. Salzman, Lt. Fary, and Sgt. Field responded to Deputy Crossan's call. (*Id.* ¶ 6.) The officers then demanded that Mouzon either return his medication or agree to be handcuffed to allow for a search of his cell. (*Id.*) When

5

Mouzon again failed to comply, an unidentified individual deployed oleoresin capsicum ("OC") spray into Mouzon's cell, but failed to contact Mouzon's face. (*Id.* ¶ 7.) Lt. Fary then began to film the encounter on a cell phone. (*Id.* ¶ 8; ECF Nos. 62-3 ("Video 1") – 63-4 ("Video 2").)

Lt. Fary's video begins depicting Lt. Salzman speaking with Mouzon, telling him "you have do one of those two things . . . . either back up to the door—I'm gonna open the door—or put your hands through the food slot." (Video 1, 00:09 – 00:28.) After Mouzon failed to respond or move, Lt. Salzman opened Mouzon's cell door. (*Id.* at 00:30 – 00:35.) In contravention of Lt. Salzman's order, Mouzon proceeded to approach the door face first, with his hands in the air, stating "I will walk of out of here with no problems." (*Id.* at 00:40 – 00:50.) Mouzon then again disregarded Lt. Salzman's direction that he turn around and present his hands and instead walked back to the rear of his cell. (*Id.* at 00:50 – 00:52.) In response, Lt. Salzman directed Deputy Crossan to deploy OC spray. (*Id.* at 00:51.) Deputy Crossan did so, targeting the back of Mouzon's head and the walls behind him. (*Id.* at 00:54 – 00:58.)

### 2.   Officers' Third and Fourth Deployments of OC Spray

After being sprayed, Mouzon began to pace around his cell, repeatedly stating "weak ass shit" and informed the officers outside that "when [they] come in here, [they] would see] there ain't no motha fucking pill in here." (*Id.* at 01:04 – 01:22.) Lt. Salzman then once more informed Mouzon that he would have to put handcuffs on before being

let out of his cell, in response to which Mouzon stated, "I still ain't putting handcuffs on." (*Id.* at 01:24 – 01:29.)

Mouzon remained at the back of his cell for approximately a minute and disregarded at least one more direction to "cuff up" (*id.* at 01:30 – 02:20), after which Deputy Crossan deployed another burst of OC spray, which hit Mouzon's head and back (*id.* at 02:22 – 02:26). Mouzon continued to disregard orders to "cuff up" and Deputy Crossan then deployed a fourth burst of OC spray, which primarily hit Mouzon's back and left shoulder blade, as well as the wall behind him. (*Id.* at 02:27 – 02:52.)

### 3.   Officers' Fifth Deployment of OC Spray

For the next several minutes, Mouzon coughed, paced, and yelled a variety of profanities, all while repeatedly exclaiming that officials should "pop this motha fucking door." (*Id.* at 02:52 – 03:27.) Mouzon continued this behavior even as Deputy Adekunle attempted to speak with him and offered him the opportunity to shower and decontaminate himself. (*Id.* at 03:27 – 07:23.) Several minutes passed before a group of officers stepped away from the door. (*Id.* at 07:23 – 07:34.)

The second video begins by showing Sgt. Wright, Sgt. Field, Deputy Crossan, and Deputy Adekunle returning to Mouzon's cell. As he had done in much of Video 1, Mouzon continued to yell and threaten FCADC officials, exclaiming, "I wanna fight" and "come on, pop this motha fucking door." (Video 2, at 00:00 – 01:46.) Eventually, officials, including Deputy Adekunle, turned off the water in Mouzon's cell. (*Id.* at 01:48 – 02:34.) Sgt. Wright then approached Mouzon's cell door and directed Mouzon to "turn

around and cuff up." (*Id.* at 03:00 – 03:04.) Mouzon responded, "pop this door and I'm swinging." (*Id.* at 03:04 – 03:08.)

Sgt. Field was next directed to deploy OC spray if an opportunity presented itself, in response to which Mouzon repeatedly stated "spray me again, do it." (*Id.* at 03:15 – 04:00.) Sgt. Field ultimately did administer more OC spray, hitting Mouzon's face and the wall behind him. (*Id.* at 04:00 – 04:05.)

At this point, Lt. Salzman asked Sgt. Wright whether he should use a "pepperball launcher" in an effort to gain Mouzon's compliance.[3] (*See* ECF No. 62-1, at 2–3 ¶ 13.) Sgt. Wright declined, believing it was not yet necessary to escalate the situation. (*Id.*)

Mouzon continued to yell and groan for approximately two minutes and repeatedly declined to comply with staff directives to approach the cell door with his hands behind his back. (*Id.* at 04:05 – 05:53.) Deputy Adekunle then again approached the door and attempted to converse with Mouzon, including by offering him another opportunity to shower. (*Id.* at 05:53 – 06:58.) Mouzon declined the opportunity and continued to yell over Adekunle's attempts to speak. (*Id.*) After Adekunle walked away from the door, Mouzon continued to yell—and apparently attempted to communicate to another inmate named "Trey"—for approximately one minute. (*Id.* at 06:58 – 07:51.)[4] Adekunle again approached and was again rebuffed by Mouzon. (*Id.* at 07:51 – 10:23.)

---

[3] A pepperball launcher is a device resembling a paintball gun that is "powered by carbon dioxide, nitrogen, or compressed air which projects a plastic frangible sphere, containing OC, designed to burst upon impact." (ECF No. 62-2 ¶ 13.)

[4] At this point in Video 2, the audio track cuts out, and the Court is therefore unable to independently verify what Mouzon or FCADC staff members were saying. To the extent other

### 4.    Initial Use of the Pepperball Launcher

Having received authorization to use the pepperball launcher, Sgt. Wright approached Mouzon's cell door with the device. (*Id.* at 13:24; *see* ECF No. 62-2, at 3 ¶ 18.) When Mouzon failed to comply with Sgt. Wright's directives to "cuff up at the door," Wright attempted to fire a pepperball volley through the cell's tray slot. (*See* ECF No. 62-1, at 4 ¶ 21; Video 2, at 13:25 – 14:05.) The launcher, however, failed to fire, and Mouzon took this opportunity to begin repeatedly kicking his foot through the tray slot opening. (*Id.* at 14:05 – 14:50.)

Sgt. Wright eventually fixed the pepperball launcher and fired several shots at the wall of Mouzon's cell, not his person, stopping when projectiles fell from the launcher's hopper. (*Id.* at 14:50 – 14:55.) After collecting the loose pepperballs, Sgt. Wright fired another volley into the cell. (*Id.* at 14:56 – 15:14.) Mouzon began to cough and wheeze from the pepperball saturation, and at times kneeled to the ground, but did not approach the cell door. (*Id.* at 15:15 – 22:49.) Throughout this time, Mouzon continued yelling phrases such as "this shit makes me stronger," as several FCADC officials approached Mouzon's cell and attempted to converse with him. (*Id.*)

### 5.    Continued Use of Pepperball Launcher after Failure to Comply

Sgt. Wright then shot more pepperballs, this time directing his aim at Mouzon's person rather than the walls of the cell. (*Id.* at 22:50 – 23:30.) Mouzon then dropped to

---

evidence in the record—like Sgt. Wright's declaration—describes the content of the dialogue between Mouzon and FCADC staff, that evidence is undisputed and therefore accepted by the Court as true.

one knee before covering himself with his mattress. (*Id.* at 22:15 – 22:30.) All the while, Sgt. Wright continued to fire pepperballs at and around Mouzon. (*Id.* at 22:30 – 22:36.)

After roughly one minute, Sgt. Wright and Deputy Crossan ordered Mouzon to lie on the ground. (*Id.* at 24:48 – 24:52.) Mouzon—still covered by his mattress—responded, stating, "I am on the fucking ground," as Sgt. Wright fired another pepperball volley into the cell. (*Id.* at 24:53 – 25:13; ECF No. 62-2 ¶ 35.) Mouzon continued to ignore orders to approach the cell door for approximately a minute and a half, prompting Sgt. Wright to fire yet another volley of pepperballs. (ECF No. 62-2 ¶ 38; Video 2, at 25:14 – 26:51.)

Jail officials then opened Mouzon's cell. (Video 2, at 27:35.) Seven officers entered, and several others waited outside. (*Id.* at 27:35 – 28:10.) After roughly a minute and a half, officials restrained and removed Mouzon from the cell before placing him face down on a tarp and carrying him away from the scene. (*Id.* at 28:11 – 30:00.)

### C.    Placement in Restraint Chair and Medical Examination

FCADC officials carried Mouzon through a series of hallways before tipping him off of the carrying tarp and cutting off his contaminated clothing. (*Id.* at 30:01 – 39:30.) While being carried away and having his clothing cut off, Mouzon made comments such as "the shits never going to be over until one of y'all niggas feel my pain," "if I don't get my shower I am going to remember that shit," "y'all fucked up, you know what the fuck I'm locked up for?" and "I'm not threatening nobody, I don't make threats I make

10

promise[s], you can look my charges up see who I am, see my affiliations." (ECF No. 62-2 ¶¶ 43–45.)

An unidentified FCADC official informed Mouzon that decontamination by the responding medical staff was "the current option and that showering at that time was not an option." (ECF No. 62-2 ¶ 44.) Mouzon declined the opportunity to decontaminate and was placed in a restraint chair at 11:37 a.m. (*See* ECF No. 62-5, at 1, 4 ("Patient refused to have saline in his eyes and face for decontamination for OC spray and Pepper balls.").)

Medical officials checked in on Mouzon at 1:55 p.m., 3:58 p.m., 5:32 p.m., and 9:24 p.m. (*Id.* at 5–8.) Records from these check-ins documented that Mouzon was "Awake/alert/oriented." (*Id.*) They further noted that Mouzon's "pulse oxygen" was at 99% (*id.* at 1), that his respiratory status was "Good" with "No problems" (*id.* at 2), and that he had suffered only "two welts" from pepperballs (*id.*).

### D.    Removal From Restraint Chair and Opportunity to Shower

Defendants' shifts ended at 7:00 p.m., approximately seven and a half hours after Mouzon had been placed in a restraint chair. (ECF No. 62-2 ¶ 51.) After the shift change, at approximately 7:20 p.m., Mouzon was removed from the restraint chair. (ECF No. 62-7.) Mouzon showered on August 16, 2021, two days after the use of force incident. (ECF No. 62-8.)

11

## III. ANALYSIS

### A.    Claim One – Excessive Force Through Use of Chemical Agents

In Claim One, Mouzon asserts that Defendants Crossan, Salzman, Field, and Wright violated his right to be free from the use of excessive force when they deployed an excessive amount of chemical agents.  (ECF No. 28, at 1.)

Defendants' use of force implicates Mouzon's rights under the Fourteenth Amendment, because Mouzon was a pretrial detainee at the time of the incident.  *See, e.g., Young v. City of Mt. Ranier*, 238 F.3d 567, 575 (4th Cir. 2001) (applying Fourteenth Amendment to claims raised by pretrial detainee).  Under the Fourteenth Amendment, a detainee must demonstrate that a defendant "inflicted unnecessary and wanton pain and suffering upon the detainee."  *Carr v. Deeds*, 453 F.3d 593, 605 (4th Cir. 2006) (citations omitted) (internal quotation marks omitted), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010).  A detainee may prevail by "providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose."  *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015) (citations omitted).[5]

Factors a court may consider to determine whether force was objectively unreasonable may include:

> the relationship between the need for the use of force and the amount of force used; the extent of [the detainee's] injury; any effort made by the

---

[5] In *Kingsley*, the Supreme Court determined that the appropriate standard for the Fourteenth Amendment is "only that the officers' use of that force was *objectively* unreasonable," not that "the officers were *subjectively* aware that their use of force was unreasonable . . . ."  576 U.S. at 391.

officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the [detainee] was actively resisting.

*Id.* at 397 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Because "officers facing disturbances 'are often forced to make split-second judgments' . . . a court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer." *Id.* at 399 (citing *Graham*, 490 U.S. at 397). The Court must recognize that "agents of the state are permitted to exercise a certain degree of force in order to protect the interests of society." *Sawyer v. Asbury*, 537 F. App'x 283, 294 (4th Cir. 2013) (quoting *Justice v. Dennis*, 834 F.2d 380, 382 (4th Cir. 1987), *vacated on other grounds by* 490 U.S. 1087 (1989)). Thus, not every "push or shove, even if it may later seem unnecessary" is serious enough to rise to the level of a constitutional violation. *Orem v. Rephann*, 523 F.3d 442, 447 (4th Cir. 2008) (quoting *Graham*, 490 U.S. at 396), *abrogated on other grounds by Wilkins*, 559 U.S. 34. Consequently, the Court "must accord due deference to an officer's efforts to restrain a detainee when faced with a dynamic and potentially violent situation; otherwise, 'we would give encouragement to insubordination in an environment which is already volatile enough.'" *Scarbro v. New Hanover Cty.*, 374 F. App'x 366, 370 (4th Cir. 2010) (quoting *Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999)). In addition, the determination of whether excessive force was used must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397.

13

Having reviewed the summary judgment record and applied the *Kingsley* factors in the light most favorable to Mouzon, the Court concludes that Defendants are entitled to summary judgment in their favor.

### 1.    Officers' Initial Uses of OC Spray were Reasonable

Beginning with the first *Kingsley* factor—"the need for the use of force and the amount of force used," *Kingsley*, 576 U.S. at 397—there can be no question that Mouzon's behavior warranted Defendants' initial use of OC spray. As set forth in the record and explained in further depth below in relation to the other *Kingsley* factors, Mouzon repeatedly failed to comply with FCADC officials' requests and commands to either return the medication he was suspected of stashing or to peacefully consent to being handcuffed to permit a search of his cell (*see* ECF No. 62-2, at 1 ¶ 5–7), thereby justifying some initial use of physical force. *See, e.g.*, *Shiheed v. Harding*, 802 F. App'x 765, 767 (4th Cir. 2020) ("Correctional officers do not have to be under physical attack to justify the use of force; they can also use appropriate force 'to preserve internal order by compelling compliance with prison rules and procedures.'" (quoting *Brooks v. Johnson*, 924 F.3d 104, 113 (4th Cir. 2019))).

With respect to the second *Kingsley* factor, the record demonstrates that Mouzon's injuries were minimal. Although Videos 1 and 2 show Mouzon coughing from OC spray inhalation, medical records generated after the incident state that Mouzon's breathing was normal, that his pulse oxygen was at 99%, and that his "Respiratory Status" was "Good" with "No problems." (*See* ECF No. 62-5, at 1–3, 5–7.)

14

Next, as to the third *Kingsley* factor, the record demonstrates that FCADC officials endeavored *not* to use force against Mouzon.  First, and as alluded to above, Deputy Crossan repeatedly requested that Mouzon "return the medication" he was suspected of stashing and only called for assistance from other officials when those verbal efforts to gain compliance failed.  (*See* ECF No. 62-2, at 1 ¶ 5.)  Only after Defendants Salzman, Fary, and Field made additional requests to Mouzon to return the medication or to consent to being handcuffed to permit a cell search did officials deploy OC spray for the first time.  (*Id.* at 2 ¶¶ 6–7.)  These officers were not required to wait until Mouzon's defiance of orders escalated to use some degree of force.  *See, e.g., Shiheed*, 802 F. App'x at 767; *Cooper v. Williams*, No. 1:20cv280 (RDA/TCB), 2021 WL 3779633, at *10 (E.D. Va. Aug. 24, 2021) ("[Defendants] were not required to wait until the sprinkler head was busted and the cell started to flood before removing Plaintiff from the cell.").  The Court is therefore satisfied that Defendants attempted to "temper or to limit the amount of force." *Kingsley*, 576 U.S. at 397.

The fourth and fifth *Kingsley* factors, which relate to the severity of the problem and the officer's perception thereof, *see Kingsley*, 576 U.S. at 397, also speak to the reasonableness of Defendants' actions.  Indeed, on two previous occasions, Mouzon had been found to be under the influence of an unknown substance and to have hoarded or stashed medication.  (ECF No. 62-1, at 11, 13–14).  Defendants' belief that Mouzon was again hoarding medication—which could present a threat to other detainees and staff members alike—was therefore entirely reasonable.  *See Burr v. Macon Cnty. Sheriff's*

15

*Office*, No. 1:17-cv-76-FDW, 2019 WL 148714, at *4 (W.D.N.C. Jan. 9, 2019) (identifying detainee's hoarding of medication and disregarding orders as valid basis for use of force).

The *Kingsley* factors thus resolve in Defendants' favor as it relates to their initial use of OC spray on Mouzon.

### 2.    Officials' Continuing Use of OC Spray was Reasonable

The foregoing analysis of the first, second, fourth, and fifth *Kingsley* factors also applies to Defendants' third and subsequent uses of OC spray.  The sixth *Kingsley* factor, however, which relates to whether a detainee is actively resisting, *see Kingsley*, 576 U.S. at 397, also resolves in Defendants' favor.  Indeed, rather than complying following the two initial deployments of OC spray, Mouzon acted in an increasingly animated, angry, hostile, and noncompliant fashion, exclaiming that the OC spray used on him was "weak ass shit" and stating out loud that he would not agree to put on handcuffs.  (*See* Video 1, at 01:04 – 01:29.)  After the fourth use of OC spray, Mouzon's behavior escalated even more.  At this point in the incident, Mouzon began to threaten FCADC officials, urging them to "pop th[e] motha fucking door" (*see* Video 1, at 02:52 – 03:27) and stating "I wanna fight" (*see* Video 2, at 00:00 – 01:46).

Consistent with these facts, there can be no question that the sixth *Kingsley* factor resolves in Defendants' favor as to the third and later uses of OC spray.  *See Cooper*, 2021 WL 3779633, at *10 (applying sixth *Kingsley* factor, concluding that detainee's

16

"verbal threat to the officers to come into the cell because he had 'something' for them, and his aggressive stance" spoke to the reasonableness of officials' use of force).

### 3.   Officials' Initial Use of a Pepperball Launcher was Reasonable

Turning to the next chapter in the use of force incident, the Court addresses Defendants' decision to utilize a pepperball launcher. As before, several of the *Kingsley* factors already discussed speak to the reasonableness of this decision. The Court pauses to further address the second and third factors.

As to the second factor, the record establishes that Mouzon's injuries resulting from the pepperball launcher were minimal. Indeed, the medical records generated after the use of force incident demonstrate that Mouzon had "just two welts" about which he voiced no pain." (ECF No. 62-5, at 2.) Mouzon apparently only showed these welts to medical staff to determine "if [the] skin was broken for infection purposes." (*Id.*) The second *Kingsley* factor therefore resolves in Defendants' favor as to use of the pepperball launcher.

Next, as to the third factor, the record demonstrates that Defendants attempted to limit their use of force with respect to the pepperball launcher. In fact, Sgt. Wright initially declined Lt. Salzman's suggestion to use the instrument, believing it was not yet necessary and that they could gain Mouzon's compliance without it. (*See* ECF No. 62-2, at 2–3 ¶ 13.) Moreover, once Defendants elected to use the pepperball launcher, they first utilized it to saturate the air of Mouzon's cell and did not directly target his person. (*See id.* at 4 ¶ 23.) This, too, represented an effort to limit the severity of the use of force.

17

For these reasons, the Court concludes that Defendants' decision to utilize a pepperball launcher was constitutionally reasonable.

### 4.    Officials' Continued Use of Pepperballs was Reasonable

Defendants' continued use of the pepperball launcher was also reasonable.  Of particular relevance to this conclusion are the third, fourth, fifth, and sixth *Kingsley* factors.  As to the third factor, the record shows that Defendants once more attempted to temper their use of force by not firing the pepperball launcher at Mouzon's person until his behavior warranted it.  In the buildup to this development, Mouzon attempted to kick Defendants through his tray slot door (*see* Video 2, at 14:22), yelled that the chemical agents made him stronger (*see* ECF No. 62-1, at 4 ¶ 25), and defied orders from FCADC officials (*see id.* at ¶¶ 25, 26, 31, 37).

Mouzon's escalating behavior also tilts the fourth, fifth, and sixth *Kingsley* factors in Defendants' favor.  To address the factors out of order and begin with the sixth, it is of course the case that Mouzon's decision to repeatedly kick through his cell's tray slot door amounted to active resistance warranting further action from Defendants.  *See Jackson-Boulet v. Alfaro*, No. H-20-2584, 2023 WL 5732695, *7 (S.D. Tex. Sept. 1, 2023) (granting summary judgment to defendant-officer who (1) grabbed plaintiff's arm, which he had thrust through tray slot door, and (2) punching the plaintiff after plaintiff began striking and kicking at officers).  This behavior also tips the fourth and fifth factors in Defendants' favor, for, by kicking at Defendants, Mouzon turned from a noncompliant detainee into an immediate physical threat, and Defendants would reasonably have

18

perceived as much. *See id.* at *6 (concluding that plaintiff had created a security threat by "thrusting his arm through the tray slot in the dayroom door").

Consistent with this analysis, Defendants have demonstrated their entitlement to judgment as a matter of law regarding their uses of force, and their Motion for Summary Judgment will therefore be GRANTED as to Claim One and its subparts.

### B.    Claim Two – Failure to Allow Decontamination

In Claim Two, Mouzon asserts that Defendants Crossan, Salzman, Field, and Wright violated his constitutional rights by acting with deliberate indifference to his serious medical needs, specifically by failing to permit him to decontaminate after subjecting him to chemical agents.[6] (ECF No. 28, at 2; ECF No. 73, at 2.)

To establish a constitutional violation based on a correctional official's alleged failure to appropriately respond to medical needs, pretrial detainees must demonstrate:

---

[6] The Second Particularized Complaint and Mouzon's Opposition make clear that the crux of Claim Two is Defendants' alleged refusal to permit Mouzon to decontaminate, not the use of force via the restraint chair. (*See* ECF No. 28, at 2; ECF No. 73, at 2.) Accordingly, the Court assesses Claim Two from this perspective. To the extent, however, Mouzon intended to characterize Claim Two as an excessive force claim based on the use of the restraint chair, the Court is satisfied that Defendants are entitled to judgment in their favor as to any such claim, for "[p]lacement of recalcitrant, disruptive, or suicidal inmates in restraint chairs as a means to maintain 'order and control' is not a violation of the Constitution." *Strickland v. Turner*, No. 9:15-0275-PMD-BM, 2018 WL 3151639, at *19 (D.S.C. Jan. 28, 2018), *R&R adopted*, 2018 WL 1443953 (D.S.C. Mar. 23, 2018) (citing *Williams v. Benjamin*, 77 F.3d 756, 763–64 (4th Cir. 1996)). Given Mouzon's repeated defiance of orders and unruly behavior, his roughly seven-hour placement in a restraint chair was not unlawful. *See Blakeney v. Rusk Cnty. Sheriff*, 89 F. App'x 897, 899 (5th Cir. 2004) (holding that pretrial detainee's rights were not violated when he was placed in restraint chair for twenty hours after he disobeyed orders and engaged in unruly, destructive practices, since the purpose was not punishment); *Mackey v. Anderson Cnty. Det. Ctr.*, No. CA 6:06-1180-GRA-WMC, 2007 WL 1656231, at *1 (D.S.C. June 6, 2007) (finding that a detainee's placement in a restraint chair for twelve hours was not a *per se* violation of the plaintiff's Fourteenth Amendment rights).

(1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023). The Fourth Circuit explained:

The objective test we adopt today differs from our prior subjective test in one respect only. The plaintiff no longer has to show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm. That showing remains sufficient, but it is no longer necessary. Now, it is sufficient that the plaintiff show that the defendant's action or inaction was, in *Kingsley*'s words, "objectively unreasonable," 576 U.S. at 397; that is, the plaintiff must show that the defendant should have known of that condition and that risk, and acted accordingly. Or as the Supreme Court put it when describing civil recklessness in *Farmer*, it is enough that the plaintiff show that the defendant acted or failed to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."

*Id.* (parallel citations omitted) (citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

Clearly, "an inmate's rights can be violated when officers withhold proper medical attention or basic hygienic remedies such as a shower or a change of clothes after deploying a chemical agent, thereby allowing the painful effects to linger." *Fobbs v. Hunt*, No. 3:21cv26, 2021 WL 1792087, at *9 (E.D. Va. May 5, 2021); *see also Iko v. Shreve*, 535 F.3d 225, 240, 242–43 (4th Cir. 2008) (determining that officers were deliberately indifferent to inmate's medical needs when they "were all aware that Iko had been doused in pepper spray," saw him collapse in the medical room, and did not seek any medical evaluation or even decontamination).

20

Here, the record shows that several FCADC officials offered Mouzon

decontamination showers during the period he resisted leaving his cell and that Mouzon

declined those requests, either explicitly or implicitly. (*See* Video 1, at 03:27 – 07:23;

Video 2, at 05:53 – 06:58 (screaming over and throughout officer offering opportunity to

shower)). The record further shows that, once Mouzon was removed from his cell, his

contaminated clothing was promptly cut off of him, and medical officials arrived to check

on and decontaminate him. (*See* Video 2, at 35:08 – 39:30; ECF No. 62-2 ¶ 44; ECF

No. 62-5, at 1, 4.) Mouzon again declined the form of decontamination offered to him—

saline solution for his eyes and face—stating that he preferred to shower. (ECF No. 62-2,

at 6 ¶ 44; ECF No. 62-5, at 1, 4.) Finally, the record shows that medical officials checked

on Mouzon at least three times during the course of the afternoon he spent confined in a

restraint chair. (*See* ECF No. 62-2, at 5–8.)

The record thus demonstrates that Defendants, and FCADC staff as a whole, were

not deliberately indifferent to Mouzon's needs. They neither denied Mouzon

opportunities to decontaminate nor withheld appropriate medical attention from him.

Rather, Mouzon repeatedly declined the decontamination opportunities offered to him.

The only possible act that could be construed as a denial of an opportunity to

decontaminate came when an unidentified official informed Mouzon that he could not

shower and that decontamination by medical staff was his only opportunity. (*See* ECF

No. 62-2 ¶ 44.) But to the extent Mouzon's claim specifically centers on this "denial,"

the Court finds FCADC officials' refusal to unshackle Mouzon to permit him to shower

21

to have been reasonable given Mouzon's repeated threats. And to the extent Mouzon seeks relief from Defendants based on his failure to fully decontaminate until two days after the use of force, the record does not contain any evidence to suggest that Defendants remained on duty at that time or had any further interactions with Mouzon such that they may be held liable.

For these reasons, the Court concludes that no reasonable jury could conclude that Defendants violated Mouzon's rights with respect to his decontamination, and the Motion for Summary Judgment will accordingly be GRANTED as to Claim Two.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 61) will be granted. Claims One and Two, and the action as a whole, will be dismissed.

An appropriate Final Order will accompany this Memorandum Opinion.

/s/

Date: February 12, 2026
Richmond, Virginia

HENRY E. HUDSON
SENIOR UNITED STATES DISTRICT JUDGE